2001-NMCA-045

27 P.3d 1019

Johnny CHAMBERLAND and Laquita Chamberland, Individually and as Husband and Wife, Plaintiffs–Appellants,

v.

ROSWELL OSTEOPATHIC CLINIC, INC., Manual Fachado, D.O., and Patrick Kelley, D.O., jointly and severally, Defendants–Appellees.

No. 20,701.

Court of Appeals of New Mexico.

June 21, 2001.

Certiorari Denied, No. 27,030, Aug. 9, 2001.

Kevin J. Hanratty, Hanratty Law Firm, Artesia, NM, L. Christopher Breard, Breard Law Firm, Ltd., Gulfport, MS, for Appellants.

Alice Tomlinson Lorenz, Gregory W. Chase, Miller, Stratvert & Torgerson, P.A., Albuquerque, NM, for Appellees.

## OPINION

BOSSON, Chief Judge.

{1} In this appeal we discuss the elements of independent intervening cause as an affirmative defense and the evidence necessary to justify a jury instruction on it, particularly in light of the limited role our Supreme Court has assigned to independent intervening cause after *Torres v. El Paso Elec. Co.*, 1999–NMSC–029, 127 N.M. 729, 987 P.2d 386. We also discuss the appropriate remedy when the independent intervening cause instruction is given in error. We hold that the jury in this case should not have been instructed on independent intervening cause, and we reverse the defense verdict and remand for a new trial.

## BACKGROUND

{2} After experiencing abdominal pain for a day, Plaintiff Johnny Chamberland (Johnny) went to the Roswell Osteopathic Clinic (Clinic) on Saturday, October 21, 1995, to see a doctor. Johnny was seen by Dr. Kelley who physically examined him and had a blood test and urinalysis performed. The lab results revealed that Johnny's blood had an elevated white blood cell count indicating the presence of an acute infection. The urinalysis revealed the presence of blood and protein, abnormal conditions for males. Because Johnny did not have any of the classic symptoms of appendicitis, such as tenderness in the abdomen, guarding, decreased bowel sounds, nausea or vomiting, Dr. Kelley concluded that Johnny had a urinary tract infection. He prescribed antibiotics and painkillers to treat the infection, and sent Johnny home. However, Dr. Kelley felt that Johnny needed to be observed closely, and asked him to return to the Clinic to have his blood and urine tested again. A repeat visit with Dr. Kelley followed three days later.

{3} After continuing to experience persistent discomfort, Johnny returned to the Clinic on the following Saturday and was seen by

Dr. Fachado. Dr. Fachado had another urinalysis and blood test performed. Although the urinalysis was "[c]ompletely normal," Johnny's white blood cell count was higher than ever. Dr. Fachado's examination revealed that Johnny's prostate gland was inflamed, and he diagnosed Johnny's condition as prostatitis. Dr. Fachado changed Johnny's prescription to an antibiotic specifically for prostatitis.

{4} Over the next few days Johnny was seen by four other doctors unaffiliated with the Clinic. None of them observed the classic symptoms of appendicitis. Ultimately, Dr. Fachado referred Johnny to Dr. Kiker, a urologist, for a more comprehensive diagnosis. The classic symptoms of appendicitis were observed on October 31, 1995, ten days after Johnny's initial visit to the Clinic, and Johnny was then referred to a surgeon for removal of his appendix. That surgery revealed that Johnny's appendix had already ruptured, creating a large abscess. The abscess was so big that the surgeon opted not to remove what remained of the appendix, choosing instead only to drain the pus. The surgeon drained over 400 cc's of pus from the abscess in Johnny's abdomen.

{5} Johnny and his wife, Laquita, sued Drs. Kelley and Fachado alleging a failure to examine, diagnose, and treat Johnny in a manner conforming to reasonable medical standards. They sued the Clinic alleging inadequate record keeping pertaining to Dr. Kelley's examinations and observations. The Chamberlands alleged that the negligence of all three Defendants caused Johnny's appendicitis to go untreated, which, in turn, caused him to suffer the abscess and other injuries and economic consequences that ultimately resulted.

{6} At trial, the Chamberlands produced expert medical testimony that Johnny likely had appendicitis before he initially visited the Clinic, and his appendix had probably ruptured on the day he arrived there. According to this medical expert, the abscess drained by the surgeon was the direct result of Johnny's ruptured appendix, and it could have been avoided with timely surgery. As it turned out, Johnny did not present earlier with classic appendicitis symptoms because his appendix was retrocecal, meaning that the appendix was pointing towards his back, not his front, as is usually the case.

{7} Notwithstanding the positioning of Johnny's appendix and the absence of classic symptoms, the medical expert testified that if the Clinic's doctors had properly taken Johnny's medical history and performed a physical examination in a manner consistent with reasonable medical standards, Johnny's appendicitis would have been timely diagnosed and removed. The ruptured appendix caused Johnny numerous secondary infections including sepsis and adult respiratory distress, and at least two ileostomys, resulting in pain and suffering plus over $150,000 in medical bills.

{8} Defendants produced expert medical testimony that they were not negligent in examining, diagnosing, and treating Johnny. Specifically, Defendants produced evidence that the appendicitis was not reasonably detectable at the times they examined Johnny and made entries in the medical records because the classic symptoms were absent. According to Defendants' evidence, a reasonably skilled and careful physician could not have determined that Johnny needed surgery until October 31, 1995, when Johnny first exhibited classic appendicitis symptoms.

{9} After all the evidence was presented to the jury, the trial court sent the jury home and heard lengthy legal argument on the jury instructions. Over the Chamberlands' objection, defense counsel requested and received a jury instruction on independent intervening cause.

{10} Soon after the jury had been charged and its deliberations were underway, the jury foreman sent out a note requesting a "[d]efinition of the word 'proximate,' either from Black's Law Dictionary or Webster's New Collegiate Dictionary." After the trial court consulted with counsel, the jury was told to refer to the court's instructions to resolve the question. Approximately one-half hour later the jury returned the special verdict form. The jury answered "Yes" to the first question on the special verdict form, "Was any Defendant medically negligent?" In response to the next question, "Was any medi-

cal negligence of a Defendant a proximate cause of Johnny Chamberland's injuries and damages?" the jury answered "No."

## DISCUSSION

■ {11} On appeal, the Chamberlands argue that the trial court committed reversible error when it instructed the jury on the issue of independent intervening cause because neither Defendants' evidence nor their legal theory supported the instruction. The Chamberlands rely extensively on *Torres*, 1999–NMSC–029, 127 N.M. 729, 987 P.2d 386, a Supreme Court opinion issued just twelve days after the trial in this case, that dramatically limits the application of the independent intervening cause instruction under New Mexico tort law. We review jury instructions de novo "to determine whether they correctly state the law and are supported by the evidence introduced at trial." *Gonzales v. N.M. Dep't of Health*, 2000–NMSC–029, ¶ 28, 129 N.M. 586, 11 P.3d 550.

{12} At trial, Defendants urged the independent intervening cause instruction on the court over the Chamberlands' objection. Defendants argued that while Johnny was in their care, he only showed the symptoms of a urinary tract infection,[1] not appendicitis. According to Defendants, Johnny's symptoms did not shift to appendicitis until days after Dr. Fachado last saw Johnny and referred him to a specialist. Because the appendicitis was not symptomatic until after Defendants had completed their examinations, Defendants argued that the appendicitis was an intervening cause of Johnny's injuries that arose independently of the care provided by Defendants.

{13} The Chamberlands voiced their disagreement to the court. As they saw it, Defendants were merely arguing lack of causation, not an independent intervening cause, which entitled Defendants to the basic instruction on proximate cause, UJI 13–305 NMRA 2001, unadorned by any reference to independent intervening cause and without a separate instruction on that issue. The Chamberlands failed to persuade the trial court, and the court gave the additional instruction that frames the issue now before us on appeal.

■ {14} The Uniform Jury Instructions define independent intervening cause as follows: "An independent intervening cause interrupts and turns aside a course of events and produces that which was not foreseeable as a result of an earlier act or omission." UJI 13–306 NMRA 2001; *see also Thompson v. Anderman*, 59 N.M. 400, 411–12, 285 P.2d 507, 514 (1955). When supported by evidence, the theory of an independent intervening cause initially appears in the proximate cause instruction, as a cause "which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred." UJI 13–305 (providing for the optional, bracketed language in cases supporting independent intervening cause). The inclusion of independent intervening cause in UJI 13–305 and its accompanying definition in UJI 13–306 "are intended to clarify the meaning of proximate cause in cases in which there is evidence from which reasonable minds could differ in deciding whether an unforeseeable cause has broken the chain of causation." *Torres*, 1999–NMSC–029, ¶ 17, 127 N.M. 729, 987 P.2d 386.

{15} In *Torres*, our Supreme Court made clear "that the doctrine of independent intervening cause should be carefully applied to avoid conflict with New Mexico's use of several liability." *Id.* ¶ 19. The Court concluded that after the adoption of comparative negligence, instruction on the doctrine of independent intervening cause overemphasized the defendant's effort to shift fault away from himself and place it elsewhere. *Id.* ¶¶ 18, 22. The instruction also undermined the goal of simplifying our jury instructions by adding "a complex layer of analysis to the jury's determination of proximate cause." *Id.* ¶ 21. Because the instruction on independent intervening cause is "sufficiently repetitive of the instruction on proximate cause and ... apportioning fault," our Supreme Court con-

---

1. Although Dr. Kelley treated Johnny for a nonspecific urinary tract infection, Dr. Fachado diagnosed Johnny's condition as prostatitis. For simplicity, we refer to the two separate diagnoses collectively as Johnny's urinary tract infection.

cluded that the "potential for jury confusion and misdirection outweighs its usefulness." *Id.*

{16} We take the Supreme Court's cautionary language to heart. Although the issue before us does not involve comparative fault, as it did in *Torres*, the potential for juror confusion over independent intervening cause remains very real. *See* Terry Christlieb, Note, *Why Superseding Cause Analysis Should Be Abandoned*, 72 Tex. L.Rev. 161, 161 (1993) (observing that even those trained in the law are confused by the topic). Even before *Torres*, the law has consistently limited the independent intervening cause instruction to those instances in which the instruction is properly supported by the evidence and the theory of the defense. *See Coates v. Wal–Mart Stores, Inc.*, 1999–NMSC–013, ¶ 45, 127 N.M. 47, 976 P.2d 999.

■ {17} Independent intervening cause is an affirmative defense founded on public policy. That policy recognizes that once a plaintiff establishes negligence and causation in fact, the potential scope of liability could be endless unless courts create reasonable outer limits. *See Torres*, 1999–NMSC–029, ¶ 14, 127 N.M. 729, 987 P.2d 386. Those limits are phrased in the legal terminology of foreseeability and remoteness. *See id.* These concepts are embodied within the independent intervening cause instruction as a limitation imposed on causation in fact. Thus, the instruction is based on a policy determination that liability should cease at the point where an independent cause intercepts and interrupts the normal progression of causation, because it produces an injury "that which was not foreseeable as a result of an earlier act or omission." UJI 13–306.

■ {18} The relationship between causation in fact and independent intervening cause is critical to our analysis. To establish liability, there must be a chain of causation initiated by some negligent act or omission of the defendant, which in legal terms is the

cause in fact or the "but for" cause of plaintiff's injury. *See* UJI 13–305 (encompassing cause in fact within our instruction on proximate cause, defining it as "that ... without which the injury would not have occurred"); *see also Terrel v. Duke City Lumber Co.*, 86 N.M. 405, 423, 524 P.2d 1021, 1039 (Ct.App. 1974). As the chain of causation progresses in time or place from the negligent act or omission, an unforeseen force may intervene in the sequence of causation to completely disrupt its normal progression, producing unpredictable injuries. The unforeseeable force, be it a force of nature, an intentional tort, or a criminal act, gives rise to an instruction on independent intervening cause which is an affirmative defense that releases the defendant of all liability. *See Bouldin v. Sategna*, 71 N.M. 329, 333, 378 P.2d 370, 372–73 (1963) (recognizing that the instruction on independent intervening cause comes up when there is a "question of whether the causal connection between defendant's negligence and the injury was ... interrupted").

■ {19} An instruction on independent intervening cause presupposes a defendant's negligence and causation in fact. Without some initial tortious act or omission by a defendant that precipitates the plaintiff's ultimate injury, subsequent causes and their injuries cannot "intervene." Without causation in fact, there is nothing for the subsequent cause to "interrupt" or "intervene" in, and no chain of causation to break.[2] *See Kelly v. Montoya*, 81 N.M. 591, 595, 470 P.2d 563, 567 (Ct.App.1970) (observing that an independent intervening cause must "break the natural sequence of the first negligence"). If the evidence demonstrates no more than a simple dispute over causation in fact (i.e., whether the defendant's negligence did or did not cause in fact the injuries suffered by the plaintiff), then the issue for the jury is causation alone, not independent intervening cause. *See Torres*, 1999–NMSC–029, ¶ 14, 127 N.M. 729, 987 P.2d 386 (recognizing that the doctrine arose in response to

---

**2.** Although language is often used to characterize an independent intervening cause as "breaking" the chain of causation, suggesting that the negligent acts of the initial tortfeasor are no longer a causal force, cause in fact exists nonetheless. *See Torres*, 1999–NMSC–029, ¶¶ 17, 20, 127 N.M.

729, 987 P.2d 386. Breaking the chain of causation is simply the terminology used to convey the legal conclusion that despite cause in fact, policy intervenes through considerations of remoteness or lack of foreseeability to limit liability. *See id.* ¶¶ 14, 20.

liability based on cause in fact); *see also* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts*, § 44, at 301 (5th ed.1984) (recognizing the problem of [independent] intervening cause "does not arise until cause in fact is established"); Restatement (Second) of Torts §§ 431, 440 (1965) (requiring the defendant's negligent conduct to be a "substantial factor in bringing about the harm" before another cause intervenes); Christlieb, *supra*, at 162 (observing that the doctrine "presupposes the existence of more than one cause in fact"). To our knowledge, no reported New Mexico case has ever authorized the independent intervening cause instruction in the absence of causation in fact.

{20} The present dispute illuminates the distinction between a true independent intervening cause and a mere dispute over causation in fact without an independent intervening cause. In the case before us, only two scenarios were possible in regard to the appendicitis: either it was present at the time Defendants examined Johnny or it was not. If, as the Chamberlands' evidence showed, the appendicitis was present and detectable through the exercise of ordinary care when Defendants examined Johnny, then Defendants were negligent if they failed to exercise reasonable care, and liable for injuries proximately caused if that negligence was a cause in fact of the abscesses and other injuries that followed. On the other hand, as Defendants argued to the jury, if the appendicitis was not reasonably detectable at that point in time (even if it existed in fact), then any negligence in the course of Defendants' examination, record keeping or treatment with respect to Johnny's urinary tract infection, could not have been a cause in fact of Johnny's abscesses and other injuries. According to the undisputed evidence, Johnny's injuries were caused solely by a ruptured appendix and not by any urinary tract infection.

{21} Neither circumstance justifies an independent intervening cause instruction. The dispute gives rise to the standard instruction on proximate cause and no more, because causation in fact is the only issue in dispute other than the quality of Defendants' medical care. Defendants appear to agree that if the jury believed that Johnny had appendicitis when he initially went to the Clinic, then the existence of appendicitis could not be an independent intervening cause of his injuries. *See* Dan B. Dobbs, *The Law of Torts*, § 186, at 461 (2000) ("If the intervening force is in operation at the time the defendant acted, it is not an intervening cause at all.").

{22} Nor does the second possible scenario, that Johnny's appendicitis did not occur until some ten days later, support an instruction on independent intervening cause. If Johnny did not have appendicitis until days after Defendants finished examining him, as they now contend on appeal, then whatever Defendants did or did not do in the course of their medical examinations, record keeping, or treatment of the urinary tract infection, bore no causal relationship to Johnny's injuries. As previously stated, Johnny's injuries were caused solely by the ruptured appendix and the resulting abscess, and not from the urinary tract infection. Here again, Defendants' theory goes to the lack of causation in fact, not to an independent intervening cause.

{23} As previously discussed, the independent intervening cause instruction presupposes causation in fact and comes into play only if the evidence shows (1) negligence by a defendant that is a cause in fact, or "but for" cause, of the plaintiff's injury, *see* UJI 13–305, and (2) the intervention of an independent, unforeseeable event that "interrupts and turns aside" the normal progression of that causation in fact, *see* UJI 13–306. Without causation in fact, there can be no independent intervening cause. Therefore, in this case neither evidence nor theory justified instructing the jury on independent intervening cause, and, as in *Torres*, that instruction led to "the interjection of a false issue into the trial." 1999–NMSC–029, ¶ 22, 127 N.M. 729, 987 P.2d 386 (internal quotation marks omitted).

{24} In a similar vein, Defendants characterize Johnny's appendicitis as an independent intervening cause akin to a force of nature. In doing so, Defendants attempt to distinguish *Torres*, which expressly excluded forces of nature from its analysis limiting the use of the independent intervening cause instruction. *See id.* ¶ 15 n. 2. A force of nature is modern phraseology for what

New Mexico's appellate opinions formerly referred to as an Act of God. *See* Dobbs, *supra,* § 191, at 474. Construed in this manner, we observe that our Supreme Court has applied the force of nature analysis "only to such an extraordinary and unexpected [event] . . . as cannot be prevented by human care, skill or foresight." *Trotter v. Callens,* 89 N.M. 19, 21, 546 P.2d 867, 869 (Ct.App.1976). If an injury "could have been avoided by defendant in the exercise of ordinary care under the circumstances," the defendant is liable nonetheless. *Cf.* UJI 13–1618 NMRA 2001 (defining Act of God defense). The full instruction, UJI 13–1618, reads:

> The defendant contends that the accident and the claimed damages resulted from an act of God. An act of God is an unusual, extraordinary, sudden and unexpected manifestation of the forces of nature for which no human is responsible.
>
> The defendant is not liable if you find that an act of God was the sole proximate cause, and would have caused the accident and claimed damages regardless of whether the defendant was negligent. Defendant is liable, on the other hand, if you find that the accident and damages could have been avoided by defendant in the exercise of ordinary care under the circumstances of the act of nature.

{25} Defendants did not request an "Act of God" instruction and none was given. The issue of Act of God, or force of nature, was never presented to the jury, and it was Defendants' duty to do so. Furthermore, despite defense counsel's representations to this Court on oral argument, there was no medical evidence that the appendicitis did not exist until October 30 or 31, or that it came about on that date as a "unusual, extraordinary, sudden and unexpected manifestation of the forces of nature for which no human is responsible." *Id.* No doctor so testified. The force of nature theory appears to be an afterthought of counsel. *See Torres,* 1999–NMSC–029, ¶ 24, 127 N.M. 729, 987 P.2d 386 (noting that absent allegations of one of the traditional fact patterns amounting to an independent intervening cause, which include intentional torts, criminal conduct, extraordinary negligence, or forces of nature, "the complete defense of independent intervening cause" is unwarranted).

{26} Having determined that the court erred in giving an instruction unsupported by the evidence, prejudice is presumed. As our Supreme Court stated in *Kennedy v. Dexter Consol. Sch.,* 2000–NMSC–025, ¶ 26, 129 N.M. 436, 10 P.3d 115 (citing *Adams v. United Steelworkers of Am.,* 97 N.M. 369, 374, 640 P.2d 475, 480 (1982)), "[w]e compel the reversal of errors for which the complaining party provides the slightest evidence of prejudice and resolve all doubt in favor of the complaining party." The Chamberlands have met their burden by demonstrating that there was no evidence to support the instruction. *See Scott v. Woods,* 105 N.M. 177, 187, 730 P.2d 480, 490 (Ct.App. 1986); *Salinas v. John Deere Co.,* 103 N.M. 336, 341, 707 P.2d 27, 32 (Ct.App.1984); *Perfetti v. McGhan Med.,* 99 N.M. 645, 655, 662 P.2d 646, 656 (Ct.App.1983); *see also Kennedy,* 2000–NMSC–025, ¶ 29, 129 N.M. 436, 10 P.3d 115, *Torres,* 1999–NMSC–029, ¶ 22, 127 N.M. 729, 987 P.2d 386. With prejudice presumed from an instruction unsupported by the evidence, reversal and remand for a new trial is required. We also observe that Defendants alone undertook the risk of demanding an instruction in the face of strenuous objection and questionable support in the record. It has always been the law in New Mexico that "after injecting [error] into the case to influence the jury, the [appellee] ought not to be heard to say, after he has secured a conviction, it was harmless." *State v. Rowell,* 77 N.M. 124, 129, 419 P.2d 966, 970 (1966).

## CONCLUSION

{27} The judgment on the jury verdict in this case is hereby reversed, and the case is remanded for a new trial. Given our disposition of the appeal, discussion of the Chamberlands' other appellate issues is unnecessary.

{28} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID, Judge, CELIA FOY CASTILLO, Judge.