**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: May 6, 2014

Docket No. 31,723

ANTHONY and CHENG SILVA,
Individually and as Personal
Representatives of the Estate of
SUSAN SILVA, Deceased, and
ANTHONY SILVA, JR., and
JINLEN SILVA, as Surviving
Siblings of SUSAN SILVA,

        Plaintiffs-Appellees,

v.

LOVELACE HEALTH SYSTEM, INC.,
and DR. ISABEL LOPEZ-COLBERG,

        Defendants-Appellants.

APPEAL FROM THE DISTRICT COURT OF VALENCIA COUNTY
William A. Sanchez, District Judge

Bowles and Crow
Jason Bowles
B. J. Crow
Albuquerque, NM

Foster, Rieder & Jackson, P.C.
Travis G. Jackson
Albuquerque, NM

for Appellees

Domenici Law Firm, P.C.
Pete V. Domenici, Jr.
Lorraine Hollingsworth
Albuquerque, NM

1

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Edward R. Ricco
Jocelyn Drennan
Albuquerque, NM

for Appellants

**OPINION**

**FRY, Judge.**

**{1}**     In this case, we address the doctrine of independent intervening cause in circumstances where the evidence was conflicting as to whether the conduct of Plaintiffs' relative, the decedent, was (1) intentional and (2) foreseeable.  Plaintiffs sued Lovelace Health System, Inc., and Dr. Isabel Lopez-Colberg (collectively, Defendants) for the wrongful suicide death of Susan Silva (Decedent) on the theory that Dr. Lopez-Colberg negligently prescribed Decedent twelve months of antidepressant refills without requiring follow-up visits while knowing that the drug may cause suicidality in patients.  Defendants raised several defenses to Plaintiffs' claims, including the defense that Decedent's overdose on antidepressants and resulting suicide constituted an independent intervening cause that eliminated any liability they might have for their own negligence.  The district court refused to instruct the jury on this defense.  On appeal from a jury verdict against them, Defendants argue that the district court erred in (1) refusing to instruct the jury on suicide as an independent intervening cause, and (2) denying Defendants' motion for a directed verdict on Plaintiffs' loss of consortium claims.

**{2}**     On the first issue, we acknowledge that, in cases involving only the negligence of the parties, our Supreme Court has virtually eliminated the defense of independent intervening cause.  *See Torres v. El Paso Elec. Co.*, 1999-NMSC-029, ¶ 13, 127 N.M. 729, 987 P.2d 386, *overruled on other grounds by Herrera v. Quality Pontiac*, 2003-NMSC-018, ¶ 33, 134 N.M. 43, 73 P.3d 181.  However, independent intervening cause may still apply in cases where there are intentional or criminal acts or forces of nature that are unforeseeable.  In this case, we conclude that the evidence gave rise to reasonable inferences that Decedent's acts of overdosing on antidepressants and committing suicide may have been intentional rather than negligent and that these acts may have been unforeseeable.  This evidence could theoretically lead a properly instructed jury to conclude that these intentional acts constituted an independent intervening cause that interrupted and negated any negligence by Dr. Lopez-Colberg in prescribing the drug to Decedent.  We therefore hold that the district court erred by failing to instruct the jury on Decedent's suicide as an independent intervening cause.  It was for the jury, not the district court, to determine whether Decedent's suicide was intentional and foreseeable to Dr. Lopez-Colberg.  We therefore reverse and remand.

**{3}**     On the second issue, which we address in the event it arises on remand, we hold that Plaintiffs failed to show the degree of mutual dependence required to support their loss of

2

consortium claims.

## I.    BACKGROUND

**{4}**    This wrongful death case is based on the alleged negligent treatment of Decedent by Defendants.  As stated above, the theory of Plaintiffs' case was that Dr. Lopez-Colberg gave Decedent a twelve-month prescription for paroxetine (Paxil), which allegedly "causes suicidality," and failed to follow up or monitor Decedent.  As a result, Plaintiffs claimed, Decedent "engaged in a self-mutilation suicide."  The evidence presented to the jury at trial included the following.

**{5}**    In May 2004, Dr. Lopez-Colberg began treating Decedent and diagnosed her with anxiety.  Dr. Lopez-Colberg prescribed Paxil, a selective serotonin re-uptake inhibitor, commonly used to treat depression and anxiety, at ten milligrams per day.  During the next seven months, Dr. Lopez-Colberg saw Decedent four times to address persistent symptoms, and she adjusted her Paxil dosage to twenty milligrams.  In November 2004, Decedent changed insurance carriers and began treatment with another physician.

**{6}**    In October 2005, Decedent returned to Dr. Lopez-Colberg's care.  When she returned to care, Decedent was taking twenty milligrams of Paxil a day, plus Ativan for breakthrough anxiety.  Dr. Lopez-Colberg noted that Decedent had "serotonin syndrome," which she clarified meant that Decedent was experiencing serotonin withdrawal when she forgot to take her Paxil.  Dr. Lopez-Colberg also noted that Decedent was experiencing many psychosocial stressors, which Decedent declined to detail.  Decedent's use of Ativan indicated to Dr. Lopez-Colberg that Decedent's anxiety was not under control, and Dr. Lopez-Colberg wanted to increase the Paxil dosage. Dr. Lopez-Colberg wrote Decedent two prescriptions: one month's worth of Ativan and one year's worth of Paxil (one month's worth with eleven authorized refills).  At this point, Decedent had been on twenty milligrams of Paxil for seventeen months.  After Dr. Lopez-Colberg prescribed the medication, there were no follow-up appointments scheduled, although Decedent was to return "when she fe[lt] that she would like to increase the Paxil."

**{7}**    According to a June 2005 FDA advisory, "[s]everal recent publications suggest the possibility of increased risk for suicidal behavior in adults being treated with antidepressants."  However, Dr. Lopez-Colberg's patient notes for Decedent's visits did not indicate that Decedent had any thoughts of suicide.

**{8}**    Decedent's friends and family reported that Decedent began exhibiting very strange behavior in April 2006, which was over five months after Decedent's last visit with Dr. Lopez-Colberg. On April 13, 2006, Decedent was found dead in her apartment, having taken her own life.  Toxicology analysis determined that Decedent had twenty-two times the therapeutic dose of Paxil in her system at the time of her death.  It was determined that she had obtained thirty Paxil tablets three days prior to her death, and there were no pills left in that thirty-day prescription.

**{9}**     Decedent's parents filed suit asserting negligence and wrongful death claims against Defendants.  Decedent's parents and two surviving siblings also asserted claims for loss of consortium.  Plaintiffs' claims against Defendants were tried to a jury, and Defendants argued that the jury should be instructed on their theory that Decedent's suicide constituted an independent intervening cause that absolved them of liability.  The district court refused the requested instructions, and the jury returned a verdict for Plaintiffs.

**{10}**     On appeal, Defendants argue that the district court erroneously refused to instruct the jury on their theory that Decedent's suicide was an independent intervening cause.  They also argue that the district court erred in denying their motion for directed verdict on Plaintiffs' claims for loss of consortium.  We address each contention in turn.

## II.      DISCUSSION

### A.      Independent Intervening Cause Instruction

**{11}**     Defendants argued below and on appeal that Decedent's death resulted from the intentional and unforeseeable act of suicide and, therefore, that the suicide was an independent intervening cause that released them from all liability.  As we explain, we agree with Defendant that the jury should have received instruction on this defense theory.

**{12}**     In the district court, Defendants tendered three jury instructions relevant to this theory.  The first requested instruction was based on UJI 13-305 NMRA, the definition of causation, which included the optional language relevant to independent intervening cause (italicized below):

> An act or omission is a "cause" of injury if *unbroken by an independent intervening cause*, it contributes to bringing about the injury and if the injury would not have occurred without it.  It need not be the only explanation for the injury, nor the reason that is nearest in time or place. It is sufficient if it occurs in combination with some other cause to produce the result.  To be a "cause[,"] the act or omission, nonetheless, must be reasonably connected as a significant link to the injury.

(Emphasis added.)   Second, Defendants requested an instruction based on UJI 13-306 NMRA, the definition of independent intervening cause: "An independent intervening cause interrupts and turns aside a course of events and produces that which was not foreseeable as a result of an earlier act or omission."   Third, Defendants tendered an instruction based on *Johnstone v. City of Albuquerque*, 2006-NMCA-119, ¶¶ 10-11, 140 N.M. 596, 145 P.3d 76, which holds that suicide is generally an independent intervening cause unless one of two exceptions is satisfied.  The district court refused to instruct the jury on independent intervening cause, stating, "I really don't see that these facts fit."

### 1.      Standard of Review

**{13}** We review a district court's refusal to give a proffered instruction de novo to determine whether the instruction correctly stated the law and was supported by the evidence presented at trial. *See Benavidez v. City of Gallup*, 2007-NMSC-026, ¶ 19, 141 N.M. 808, 161 P.3d 853. A party is entitled to have the jury instructed on the party's theory if there is substantial evidence to support it. *City of Belen v. Harrell*, 1979-NMSC-081, ¶ 14, 93 N.M. 601, 603 P.2d 711. In determining whether the district court erroneously denied Defendants' requested instructions, we first review the law relevant to the theory of independent intervening cause.

2.       ***Torres* and *Chamberland v. Roswell Osteopathic Clinic, Inc.*, 2001-NMCA-045, 130 N.M. 532, 27 P.3d 1019: A Plaintiff's Negligence or the Absence of a Defendant's Causation in Fact Cannot Support an Independent Intervening Cause Defense**

**{14}** Our appellate courts have recently virtually eliminated the use of the doctrine of independent intervening cause as a defense in cases involving only allegedly negligent (as opposed to intentional) conduct by the parties because the doctrine is incompatible with our system of comparative negligence. *See Torres*, 1999-NMSC-029, ¶ 18 (holding that "the jury shall not be instructed on independent intervening cause for a plaintiff's alleged comparative negligence"); *Chamberland*, 2001-NMCA-045, ¶ 19 (holding that a jury instruction on the doctrine is inappropriate where the issues involve "no more than a simple dispute over causation in fact (i.e., whether the defendant's negligence did or did not cause in fact the injuries suffered by the plaintiff)"). As explained in UJI 13-306, "[a]n independent intervening cause interrupts and turns aside a course of events and produces that which was not foreseeable as a result of an earlier act or omission." *Torres* and *Chamberland* explain that in cases involving only negligent conduct, the question is strictly one of causation, i.e., whose negligent conduct, separately or in combination, caused the plaintiff's injury. Consequently, instructing the jury on independent intervening cause in such cases overemphasizes the negligence of parties other than the defendants. *See Torres*, 1999-NMSC-029, ¶ 18 (explaining that an instruction that a plaintiff's negligence could constitute an independent intervening cause "unduly emphasize[s] a defendant's attempt to shift fault to a plaintiff"). In the case before us, the district court relied on *Torres* in refusing to instruct the jury on the doctrine.

**{15}** The circumstances in *Torres* demonstrate why it is inappropriate to base the defense of independent intervening cause on the plaintiff's negligence. In that case, the plaintiff was electrocuted when he touched a metal rod to a high voltage conductor while installing a roof for his employer. *Id.* ¶ 4. He sued the electric co-op that had installed and maintained the conductor. *Id.* ¶ 5. The co-op claimed that, even if it had been negligent, the negligence of the plaintiff and others superseded its negligence. *Id.* ¶ 8. On appeal from a jury verdict in favor of the co-op, our Supreme Court held that instructing the jury on the co-op's defense of independent intervening cause was reversible error. *Id.* ¶ 2. The Court reasoned that, in a case where a defendant argues that the plaintiff's *negligence* was an independent intervening cause, the jury instruction on causation alone will suffice because an instruction

5

on independent intervening cause "unduly emphasize[s] a defendant's attempt to shift fault to a plaintiff." *Id.* ¶ 18. "[T]his undue emphasis creates an unacceptable risk that the jury will inadvertently apply the common law rule of contributory negligence[.]" *Id.* The Court concluded that "the jury shall not be instructed on independent intervening cause for a plaintiff's alleged comparative negligence." *Id.* Notably, however, the Court cautioned that its analysis "does not extend to *intentional* tortious or criminal acts or forces of nature." *Id.* ¶ 15 n.2 (emphasis added).

**{16}** Two years after *Torres* was decided, this Court in *Chamberland* further refined the role played by the doctrine of independent intervening cause in cases involving only negligent conduct and "plain vanilla" causation. The issue in *Chamberland* involved whether the defendants' conduct was or was not the cause in fact of the plaintiff's injury. The plaintiff sued two doctors and their clinic for failing to diagnose his appendicitis before his appendix ruptured and caused an abscess. 2001-NMCA-045, ¶¶ 2-5. The defendants argued that the plaintiff's appendicitis was an independent intervening cause "that arose independently of the care provided by [the d]efendants" because the plaintiff did not present with any of the classic symptoms of appendicitis until after the defendants had examined him. *Id.* ¶ 12. In other words, they maintained that the plaintiff did not have appendicitis when they examined him but only developed it sometime after their examination. On appeal from a defense verdict, we reversed on the ground that it was error to instruct the jury on independent intervening cause. *Id.* ¶ 1. Although there was no issue of comparative negligence, as there was in *Torres*, there was "the potential for juror confusion over independent intervening cause," *Chamberland*, 2001-NMCA-045, ¶ 16, because the issues involved "no more than a simple dispute over causation in fact (i.e., whether the defendant's negligence did or did not cause in fact the injuries suffered by the plaintiff)." *Id.* ¶ 19. Thus, "the issue for the jury [was] causation alone, not independent intervening cause." *Id.*

**{17}** Despite the limitations imposed in *Torres* and *Chamberland*, both cases anticipated that there could be factual circumstances where the doctrine would be relevant and applicable. As we have already noted, *Torres* carved out an exception to its limitation on the applicability of independent intervening cause, stating that the limitation "does not extend to intentional tortious or criminal acts or forces of nature." 1999-NMSC-029, ¶ 15 n.2. Similarly, this Court in *Chamberland* shed light on the circumstances in which the doctrine could be applicable. In that case, we explained the rationale behind the doctrine, which is that under some circumstances where "a force of nature, an intentional tort, or a criminal act" follows the defendant's negligent act, 2001-NMCA-045, ¶ 18, the potential scope of the defendant's liability must be limited by the remoteness or unforeseeability of the intervening force. *Id.* ¶ 17. The instruction on independent intervening cause "is based on a policy determination that [the defendant's] liability should cease at the point where an independent cause [i.e., a force of nature or an intentional or criminal act] intercepts and interrupts the normal progression of causation, because it produces an injury that . . . was not foreseeable as a result of an earlier act or omission." *Id.* (internal quotation marks and citation omitted).

**{18}** We distill three primary lessons from *Torres* and *Chamberland*. First, if the defendant is claiming only that the plaintiff's negligence caused the plaintiff's injury, it is reversible error to instruct the jury on independent intervening cause because the issues involve comparative negligence. Second, even if there is no issue involving comparative negligence but the issue revolves only around whether the defendant's negligence was the cause in fact of the plaintiff's injury, then it is error to give an instruction on independent intervening cause. Third, an instruction on independent intervening cause may be appropriate if the issue involves a claim that an intentional or criminal act or an act of nature that is unforeseeable intervenes and disrupts the chain of causation set in motion by a defendant's negligent conduct. We conclude that the third concept applies in the present case, as illustrated by the two New Mexico cases that have addressed suicide as an independent intervening cause.

### 3. Suicide as an Independent Intervening Cause

**{19}** The first case addressing suicide as an independent intervening cause is *Harrell*, 1979-NMSC-081, ¶ 14, which was decided before *Torres*. In that case, the decedent, a minor, was arrested and taken to jail, where he told his mother that he would kill himself before he would let himself be taken to the penitentiary. *Harrell*, 1979-NMSC-081, ¶¶ 5-6. After the mother told a jail official about her son's threat, the decedent hanged himself in his cell. *Id.* ¶¶ 6-7, 11. The mother sued the city, asserting that it was responsible for jail officials' failure to prevent the suicide. *Id.* ¶ 1. On appeal from judgment in the mother's favor, our Supreme Court held that it was error for the district court to refuse to instruct the jury on independent intervening cause. *Id.* ¶ 20. The Court explained that, while "it cannot be said that in every case suicide is an independent intervening cause as a matter of law[,] . . . independent intervening cause [is a] question[] for the jury, unless, as a matter of law, there is no evidence upon which to submit the issue to the jury." *Id.* ¶¶ 18, 19.

**{20}** The second relevant case involving suicide—decided after *Torres*—is *Johnstone*, upon which Defendants in the present case based one of their requested jury instructions. In *Johnstone*, the defendant's minor stepdaughter used his gun to kill herself, and her estate sued him for his alleged negligence in leaving the gun unattended. 2006-NMCA-119, ¶ 1. We affirmed summary judgment in favor of the defendant. *Id.* In our analysis, we relied on *Harrell* to observe that "[g]enerally, suicide is an independent intervening cause of death that is not foreseeable and absolves a defendant of civil liability unless, as a matter of law, there is no evidence upon which to submit the issue to the jury." *Johnstone*, 2006-NMCA-119, ¶ 10 (internal quotation marks and citation omitted).

**{21}** However, *Johnstone* noted two exceptions to the general proposition that suicide is an independent intervening cause:

> The first exception allows liability where the actor's tortious conduct induces a mental illness in the decedent from which the death results. The second is a duty that results from a special relationship between the decedent and the

defendant, that presumes or includes knowledge of the decedent's risk of suicide.

*Id.* ¶ 11 (citation omitted). In other words, these exceptions can make suicide foreseeable. The special relationship contemplated by the second exception "typically involve[s a] treatment relationship[], such as mental health professionals and their patients, and persons having direct custody and control over the decedent." *Id.* ¶ 14. Because there was no such relationship in *Johnstone* and because the defendant had no reason to suspect the decedent's intention to commit suicide, the suicide was unforeseeable as a matter of law, and summary judgment was appropriate. *Id.* ¶¶ 13-14.

**{22}** Considering *Harrell* and *Johnstone* in the context of *Torres* and *Chamberland*, we extrapolate two principles applicable in the present case. First, generally speaking, suicide is an intentional act that is unforeseeable. *See, e.g.*, *Solarzano v. Bristow*, 2004-NMCA-136, ¶ 14, 136 N.M. 658, 103 P.3d 582 (defining suicide as "a voluntary, deliberate, and intentional self-destruction by someone of sound mind"). Thus, if the subject injury in a case is a suicide, that circumstance "gives rise to an instruction on independent intervening cause which is an affirmative defense that releases the defendant of all liability." *Chamberland*, 2001-NMCA-045, ¶ 18. Second, evidence of one of the two exceptions stated in *Johnstone* can transform suicide into a foreseeable event. In other words, if the plaintiff can persuade the jury either (1) that the defendant induced the decedent's mental illness that resulted in the suicide or (2) that the defendant and the decedent were in a special relationship that included knowledge of the decedent's risk of suicide, then the plaintiff has established foreseeability, and the defense of independent intervening cause fails. The touchstone of the defense's success or failure is whether the suicide was foreseeable, a question the jury must decide if the evidence of foreseeability is conflicting.

### 4.    The Present Case in Context

**{23}** The case before us presents an amalgam of legal theories reflecting the teachings of both the *Torres*/*Chamberland* cases and the *Harrell*/*Johnstone* cases. This is because, in addition to raising the defense of independent intervening cause based on Decedent's intentional acts, Defendants also raised a defense related to Decedent's negligence. In order to explain the distinction between these defenses, we use the "progression of causation" model discussed in *Chamberland*. 2001-NMCA-045, ¶ 17. Starting with Plaintiffs' basic theory that Dr. Lopez-Colberg was negligent in prescribing twelve months' worth of Paxil to Decedent without requiring follow-up appointments, this allegedly negligent act started the chain of causation. Along this continuum of causation, Defendants argued that Decedent was negligent in failing to schedule a follow-up appointment with Dr. Lopez-Colberg when she began to exhibit strange behavior in April 2006 and that this negligence contributed to cause the ultimate suicide. Had this evidence, directed at the parties' comparative fault, been the only evidence presented at trial in Defendants' defense, the principles of *Torres* and *Chamberland* would clearly apply and preclude a jury instruction on independent intervening cause because the evidence would have presented only an issue of comparative

negligence. *See Torres*, 1999-NMSC-029, ¶ 18 ("[T]he jury shall not be instructed on independent intervening cause for a plaintiff's alleged comparative negligence.").

**{24}** But Defendants also presented evidence that Decedent's conduct was intentional and unforeseeable. This evidence supported the defense of independent intervening cause, a defense that, if established, would interrupt and turn aside the progression of causation and eliminate Defendants' liability for Dr. Lopez-Colberg's acts of negligence. This included evidence giving rise to inferences that (1) Decedent intentionally overdosed on Paxil in the days before her death, which induced the psychotic state that caused her to commit suicide; and (2) Decedent's intentional actions were not foreseeable to Dr. Lopez-Colberg under the *Johnstone* exceptions. We review this evidence below.

**{25}** Regarding Decedent's intentional acts, there was evidence before the district court suggesting that, in the three days before her death, Decedent had ingested an entire thirty-day supply of Paxil and that this overdose induced psychosis. In the days before she died and about five months after her last visit with Dr. Lopez-Colberg, Decedent "was behaving psychotically," according to one of Plaintiffs' experts. The expert based his assessment on the testimony of people close to Decedent, including the testimony of Decedent's co-worker and friend that two days before she died, Decedent woke the co-worker and her husband very early in the morning by screaming and pounding on their window. Prior to this incident, the co-worker had not been concerned that Decedent was depressed or worried that Decedent might hurt herself. Decedent's family, who had frequent contact with her, did not think that Decedent was suicidal prior to her death. But two days before she died, Decedent called her sister and sounded "weird" and "not like herself." About the same time, Decedent visited her parents' home and told them that she felt funny but that she had a "little pill" that she was going to take and that she would feel better.

**{26}** A day or two after this visit, Decedent's family became concerned because they had not spoken to her for a couple of days. Decedent's cousin went to her apartment to check on her and found her body. Decedent had cut her arms, legs, and throat and had slowly bled to death. Decedent was found to have "[twenty-two] times the therapeutic dose of Paxil when she had her toxicology report at death." She had obtained a thirty-day refill of Paxil three days before her death, and there were no pills left in that prescription. In the opinion of Plaintiffs' expert, Dr. Ronald Maris, Paxil contributed to the psychosis Decedent was experiencing just before she died, and she had a "near fatal dose of antidepressants in her body."

**{27}** This evidence supported the view that Decedent's overdose and suicide were intentional. Therefore, an instruction on independent intervening cause would only be improper if Decedent's intentional acts were foreseeable to Dr. Lopez-Colberg *as a matter of law*. *See Johnstone*, 2006-NMCA-119, ¶ 10 ("Generally, suicide is an independent intervening cause of death that is not foreseeable and absolves a defendant of civil liability unless, as a matter of law, there is no evidence upon which to submit the issue to the jury." (internal quotation marks and citation omitted)); *Harrell*, 1979-NMSC-081, ¶ 19

9

("[I]ndependent intervening cause [is a] question[] for the jury, unless, as a matter of law, there is no evidence upon which to submit the issue to the jury."). Foreseeability is generally a fact question for the jury. *See Davis v. Bd. of Cnty. Comm'rs*, 1999-NMCA-110, ¶ 21, 127 N.M. 785, 987 P.2d 1172 (noting, in a case involving negligent misrepresentation, that the question of foreseeability is for the jury to decide).

**{28}**     Foreseeability can be established through evidence of one of the two exceptions noted in *Johnstone*, including the "special relationship" exception that was the focus of the jury instruction conference in the district court.[1]  One element of the special relationship exception is "knowledge of the decedent's risk of suicide." *Johnstone*, 2006-NMCA-119, ¶ 11.

**{29}**     In this case, there appears to be no dispute that there was a special relationship between Decedent and Dr. Lopez-Colberg.  However, on Dr. Lopez-Colberg's knowledge of Decedent's risk of suicide, the evidence was conflicting.  On the one hand, some of the evidence presented gave rise to the inference that Dr. Lopez-Colberg could have foreseen Decedent's overdose and suicide.  Dr. Maris testified that Paxil is associated with increased suicidality, i.e., suicidal ideas, preparations, attempts, and completions.  He stated that the FDA recommends monitoring a patient closely for suicidal behavior when a physician prescribes Paxil.  Plaintiffs' other expert witness, Dr. Edward Carrington, testified that suicide is a great concern and needs to be addressed with patients who are being treated for anxiety, panic disorder, or depression.   He opined that if Dr. Lopez-Colberg had appropriately followed up with Decedent's care, she may have caught one or more of the behavioral predictors of suicide.

**{30}**     On the other hand, some of the evidence created the inference that Decedent's conduct was unforeseeable.  Dr. Maris testified that Decedent had very few suicide risk factors before she started taking Paxil and that "[i]ndividual suicides are very difficult to predict" and cannot be predicted reliably.  He stated that an adverse reaction to Paxil is a "paradoxical rare reaction." Dr. Carrington testified that, as of Decedent's last visit with Dr. Lopez-Colberg in October 2005, Decedent had been on Paxil for seventeen months straight, and this does not fit into the subset of patients who are at risk for suicidality.  He further opined that the fact that Decedent was taking Paxil as of October 2005 should not, in and of itself, have caused Dr. Lopez-Colberg to conclude that Decedent was at risk for suicide.

**{31}**     Defendants' expert, Dr. Thomas Gross, testified that, as of October 2005, there was really no reason for Dr. Lopez-Colberg to have concern about continuing Paxil, which Decedent had already been taking for a long time.  He also testified that there was nothing in Dr. Lopez-Colberg's records that would indicate that Decedent was depressed or at risk

---

[1]While we focus on the special relationship exception in this Opinion, we do not foreclose the possibility that Plaintiffs may introduce evidence of the other *Johnstone* exception of "induced mental illness" on retrial.

for suicide, and he opined that Dr. Lopez-Colberg could not have anticipated that Decedent was going to commit suicide.

**{32}** This conflicting evidence created a fact question for the jury to decide. Our courts trust juries to decide fact questions if they are appropriately guided by instructions from the district court. In this case, the evidence raised issues about (1) whether Decedent's conduct in overdosing was intentional and (2) whether Decedent's suicide was foreseeable to Dr. Lopez-Colberg. But the jury had no instruction telling it that it could determine these questions. And it had no guidance as to what the result would be if it found that the Decedent's conduct was intentional and unforeseeable.

**{33}** Defendants presented evidence supporting their theory that Decedent's intentional acts were unforeseeable, and this evidence took this case outside the limitations imposed by *Torres* and *Chamberland*. As a result, Defendants were entitled to an instruction on their theory that Decedent's intentional overdose of Paxil and ensuing suicide "interrupt[ed] and turn[ed] aside" the chain of causation initiated by Dr. Lopez-Colberg's alleged negligence—her prescribing a year's worth of Paxil without requiring follow-up visits—and produced her death, which was an unforeseeable result of Dr. Lopez-Colberg's negligence. UJI 13-306; *see Harrell*, 1979-NMSC-081, ¶ 14 ("A party is entitled to a jury instruction upon his theory of a case if it is supported by substantial evidence."). Because the district court refused to instruct on this theory, we reverse. At any retrial, the district court will instruct the jury on the defense of independent intervening cause, and the parties will have the opportunity to argue the issue of foreseeability to the jury.

## B. Loss of Consortium - Directed Verdict

**{34}** Although we reverse the judgment in favor of Plaintiffs as discussed above, nonetheless, because the issue may arise on remand, we also address Defendants' argument regarding the judgment awarding Plaintiffs damages on their claims for loss of consortium.

**{35}** Plaintiffs asserted claims for loss of consortium and presented evidence regarding the closeness of their relationships with Decedent. At the close of Plaintiffs' case, Defendants moved for a directed verdict, arguing that Plaintiffs had failed to show the degree of mutual dependence required to support their loss of consortium claims. The district court denied the motion and instructed the jury regarding the factors relevant to loss of consortium.

### 1. Standard of Review

**{36}** A district court's decision on a motion for directed verdict is reviewed de novo. *McNeill v. Burlington Res. Oil & Gas Co.*, 2008-NMSC-022, ¶ 36, 143 N.M. 740, 182 P.3d 121. A directed verdict is a drastic measure that is generally disfavored. A district court should not grant a motion for directed verdict unless it is clear that "the facts and inferences are so strongly and overwhelmingly in favor of the moving party that the judge believes that reasonable people could not arrive at a contrary result." *Melnick v. State Farm Mut. Auto.*

11

*Ins. Co.*, 1988-NMSC-012, ¶ 11, 106 N.M 726, 749 P.2d 1105.  Upon review of the district court's denial of a directed verdict, we view all of the evidence in favor of Plaintiffs, and resolve conflicts in the evidence and include all reasonable interpretations of the evidence in favor of Plaintiffs.  *See Sunwest Bank of Clovis, N.A. v. Garrett*, 1992-NMSC-002, ¶ 9, 113 N.M. 112, 823 P.2d 912.

## 2.    Elements of a Loss of Consortium Claim

**{37}**    To establish a loss of consortium claim, Plaintiffs were required to demonstrate two elements:  (1) that they had a "sufficiently close relationship" with Decedent, and (2) that Defendants owed them a duty of care.  *Wachocki v. Bernalillo Cnty. Sheriff's Dep't*, 2011-NMSC-039, ¶ 5, 150 N.M. 650, 265 P.3d 701.  Defendants do not challenge the second element.  The factors to be considered when determining whether Plaintiffs shared a sufficiently close relationship with Decedent include:

> the duration of the relationship, the degree of mutual dependence, the extent of common contributions to a life together, the extent and quality of shared experience, and . . . whether the plaintiff and the injured person were members of the same household, their emotional reliance on each other, the particulars of their day[-]to[-]day relationship, and the manner in which they related to each other in attending to life's mundane requirements.

*Id.* (omission in original) (internal quotation marks and citations omitted); *see Fitzjerrell v. City of Gallup ex rel. Gallup Police Dep't*, 2003-NMCA-125, ¶ 12, 134 N.M. 492, 79 P.3d 836 (listing "mutual dependence" factors, including "common contributions to a life together; shared experience; living in the same household; financial support and dependence; emotional reliance on each other; . . . and the manner in which they related to each other in attending to life's mundane requirements").

**{38}**    While acknowledging the factors to be considered in order to show a "sufficiently close relationship," the Supreme Court determined that "mutual dependence" is the key element to be applied to relationships of all types.  *Wachocki*, 2011-NMSC-039, ¶¶ 9, 10, 12.  In reaching this conclusion, the Court pointed to examples of cases involving "mutual dependence" in which "the parties relied on the relationship and could not enjoy life in the same way once the relationship was severed."  *Id.* ¶¶ 10, 11 (describing a case in which unmarried co-habitants made a long-term commitment to each other, ran a household jointly, and made life decisions together, and a case in which a grandparent acted as a grandchild's caretaker).

**{39}**    *Wachocki* involved two brothers who had shared a bedroom as children and an apartment for eight months prior to the death of the older brother.  *Id.* ¶ 2.  The brothers had been sharing the costs of rent, utilities, and groceries and had shared responsibilities for cooking and cleaning.  *Id.*  The brothers were close, spending free time together socializing, playing basketball, going to the movies, and going to the racetrack.  *Id.*  The younger brother

12

"considered his older brother his role model and best friend" and relied on his brother "for advice and emotional support." *Id.* The Supreme Court held that this evidence was insufficient to "demonstrate a sufficiently close relationship" and that there was no right to recover damages for loss of consortium. *Id.* ¶ 13.

**{40}** Based on the holding in *Wachocki*, we examine separately the relationships between Decedent and her parents and between Decedent and her siblings.

### 3.      Decedent's Relationship With Her Parents

**{41}** Plaintiffs presented evidence that Decedent's relationship with her parents was extremely close, that Decedent had breakfast with her father twice a week, and that she kept a bedroom at her parents' house and stayed there every weekend. Plaintiffs also presented evidence that Decedent's family was very tight-knit, that when Decedent had free time she spent it with her parents, and that Decedent was loving and protective of her parents.

**{42}** This evidence is not sufficient to demonstrate the most important factor under *Wachocki*, that the relationship between Decedent and her parents was based on "mutual dependence." Although Decedent may have spent time at the home of her parents, she was not a member of her parents' household. Decedent was not involved in her parents' day-to-day decisions or fulfillment of everyday requirements. Decedent was provided with significant support from her parents as well as the enjoyment of frequent meals and visits, but those things do not qualify as mutual dependence. Therefore, the degree of mutual dependence, if any, was not sufficient to meet the test established by the Supreme Court in *Wachocki*.

### 4.      Decedent's Relationship With Her Siblings

**{43}** Plaintiffs presented evidence that Decedent and her sister were the best of friends, that they spoke almost daily, worked out together often, and that they would stay together at their parents' house on the weekends. There was evidence that Decedent's relationship with her brother was also very close, that they shared an interest in bicycling, and that they had lived close to one another as adults. Again, the evidence presented by Plaintiffs is not sufficient to show that her relationship with either her brother or her sister was based on "mutual dependence." Decedent and her siblings were not members of the same household, and they were not together involved in day-to-day decisions. The evidence does not establish that Decedent had a "mutually dependent" relationship with either her sister or her brother.

**{44}** There is no question that losing a family member can be emotionally difficult, no matter the circumstances, but the courts must take care not to throw the doors open to "broad liability based essentially exclusively on [a] familial relationship rather than other qualities exemplified by the 'mutual dependence' factors." *Wachocki v. Bernalillo Cnty. Sheriff's Dep't*, 2010-NMCA-021, ¶ 57, 147 N.M. 720, 228 P.3d 504. Viewing the evidence in the

13

light most favorable to Plaintiffs, we conclude that, because the evidence was insufficient to establish a right to recover for loss of consortium, it was error for the district court to deny Defendants' motion for directed verdict on this issue. *See Sunwest Bank*, 1992-NMSC-002, ¶ 9 (noting a directed verdict is appropriate only when there are no true issues of fact for the jury).

## III.  CONCLUSION

**{45}**    For the foregoing reasons, we reverse and remand this case to the district court for a new trial.

**{46}    IT IS SO ORDERED.**

_____

**CYNTHIA A. FRY, Judge**

**I CONCUR:**

_____

**RODERICK T. KENNEDY, Chief Judge**

**M. MONICA ZAMORA (dissenting).**

**ZAMORA, Judge (concurring in part and dissenting in part).**

**{47}**    I concur with the Majority that the district court erred in denying Defendants' motion for directed verdict on the issue of loss of consortium and directed verdict issues. I also agree with the Majority's analysis of the applicable independent intervening cause case law. The application of our jurisprudence on the doctrine of independent intervening cause to this case has been a difficult task. However, I am not persuaded that the independent intervening cause instruction is appropriate here. I am concerned that by allowing the instruction, we are realizing the concerns of the *Torres* court by unduly over-emphasizing the Defendants' attempt to shift fault to the Decedent. For this reason, I respectfully dissent.

**Decedent's Suicide Was the Direct Result of Defendants' Negligence**

**{48}**    Decedent's act of suicide was a foreseeable risk created by Defendants' negligence. In the context of negligence, an "intervening cause" is "[a]n event that comes between the initial event in a sequence and the end result, thereby altering the natural course of events that might have connected a wrongful act to an injury." *Black's Law Dictionary* 250 (9th ed. 2009). "An independent intervening cause is one that operates on a condition produced by an antecedent cause but in no way resulted from that cause." *Id.* (emphasis in original omitted). Independent intervening cause constitutes a complete defense. *Torres*, 1999-NMSC-029, ¶ 19. In this case, the sequence of events began with Dr. Lopez-Colberg, aware

14

of the manufacturer's warning, prescribing a year's worth of Paxil for Decedent without ensuring arrangements for follow up with Decedent or to monitor Decedent's mental health, and ended with Decedent's suicide. Decedent's suicide was *the* direct result of Dr. Lopez-Colberg's negligence. Because the suicide was the final event in the chain of causation, not an unrelated, outside force that came in and interrupted the sequence of events, it cannot be an independent intervening cause.

**Negligence Analysis Negates The Doctrine**

{49}    The special verdict reveals the jury considered the issues of duty, foreseeability, proximate cause and cause in fact of decedent's death, and plaintiff's and defendant's comparative negligence guided by the tendered jury instructions. The evidence demonstrated that this case presented a dispute over causation, an issue of fact the jury decided. *See Calkins v. Cox Estates*, 1990-NMSC-044, ¶ 5, 110 N.M. 59, 792 P.2d 36 (noting causation is a question of fact). "In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person." *Ramirez v. Armstrong*, 1983-NMSC-104, ¶ 8,100 N.M. 538, 673 P.2d 822, *overruled on other grounds by Folz v. State*, 1990-NMSC-075, ¶ 3, 110 N.M. 457, 797 P.2d 2460; *see also* UJI 13-1601 Committee commentary (noting the definition of negligence instruction "includes the indispensable element of foreseeability which is discussed in *Ramirez*"). "Foreseeability is a critical and essential component of New Mexico's duty analysis because no one is bound to guard against or take measures to avert that which [she] would not reasonably anticipate as likely to happen. [T]here can be no duty in relation to another person absent foreseeability[.]" *Herrera v. Quality Pontiac*, 2003-NMSC-018, ¶ 20 (second alteration in original) (internal quotation marks and citations omitted).

{50}    The three significant jury instructions tendered to the jury were UJI 13-1601Negligence; definition; UJI 13-1603 Ordinary care; and UJI 13-305 Causation. UJI 13-1601 states in pertinent part:

An act, to be 'negligence[,'] must be one which a reasonably prudent person would foresee as involving an unreasonable risk of injury to . . . herself or to another and which such a person, in the exercise of ordinary care, would not do.

A failure to act, to be 'negligence[,'] must be a failure to do an act which one is under a duty to do and which a reasonably prudent person, in the exercise of ordinary care, would do in order to prevent injury to . . . herself or to another.

(Alterations omitted). If Decedent's suicide was not a foreseeable result, then the jury had the option to find the treatment did not cause the suicide and, as a result, not assign any liability to Defendants. UJI 13-1603 states in pertinent part: "As the risk of danger that should reasonably be foreseen increases, the amount of care required also increases." This

instruction allowed the jury to consider whether Defendant Lopez-Colberg breached her duty by prescribing the medication for an extended period of time without follow up and knowing the potential for increase in suicidiality. UJI 13-305 states in pertinent part: "An act or omission is a 'cause' of injury if it contributes to bringing about the injury, and if injury would not have occurred without it." The jury was able to consider whether the suicide was a result of the undisclosed risk and lack of follow up care by her doctor, or whether Decedent in a psychotic state or of her own free will took her own life.

**{51}** Foreseeability was an issue considered by the jury in connection with both causation and standard of care. This consideration involved a resolution of the conflicting evidence presented by the parties. Consequently, giving an instruction on independent intervening cause unduly emphasizes the Defendants' shift of fault to the Decedent by giving Defendants multiple opportunities to shift or avoid liability. The jury necessarily found that Decedent's act of suicide was a foreseeable consequence of Defendants' negligence by imposing some liability on Defendants. The jury also considered Decedent's comparative negligence by assigning her liability as well.

**{52}** The "special relationship" exception to suicide as an independent intervening cause applies to cases like this. *Johnstone*, 2006-NMCA-119, ¶¶ 10-11. There was a treatment relationship between Decedent and Dr. Lopez-Colberg in which the doctor knew or had reason to know of Decedent's risk of suicide. There was also evidence presented for the jury to consider and decide whether the Defendants' tortious conduct induced Decedent's mental instability directly causing the suicide.

**Independent Intervening Cause Doctrine Is Not Applicable In This Case**

**{53}** Decedent's suicide was the end result in the sequence of events and the question before the jury was one of causation. The independent intervening cause doctrine has no place in the analysis. In my view, the first two primary lessons noted by the Majority apply to this case.[2] Defendants' argument of foreseeability, as a complete defense, necessarily implicates Decedent's negligence as the sole cause of her death. As discussed earlier, the question before the jury was whether Defendants' negligence was the cause in fact of Decedent's death, or causation. The *Torres* court noted "a trend in New Mexico toward simplifying the complex task of the jury in deciding issues of causation" and warned that "[t]he issue of independent intervening cause adds a complex layer of analysis to the jury's determination of proximate cause." 1999-NMSC-029, ¶ 21. The Court limited the use of the instruction because it "is sufficiently repetitive of the instruction on proximate cause and the

---

[2]Notably, *Chamberland* states the independent intervening cause presupposes the Defendant's negligence and is in direct conflict with the Restatement (Second) of Torts, § 440 cmt. b. (1965) ("[T]here is no need of determining whether the actor's antecedent conduct was or was not a substantial factor in bringing about the harm."). *See Chamberland*, 2001-NMCA 045, ¶ 19.

task of apportioning fault that any potential for jury confusion and misdirection outweighs its usefulness." *Id.*

**{54}** Here, the Majority correctly points out that foreseeability is a jury issue and that a finding of foreseeability precludes a finding of independent intervening cause. However, foreseeability was argued by Defendants in connection with both causation and breach of standard of care. So, instructing the jury on independent intervening cause in addition to the other foreseeability questions is redundant and risks confusion to the jury. Because the jury already necessarily found that Decedent's suicide was foreseeable by imposing liability on Defendant, remanding this case for a new trial and giving the independent intervening cause instruction gives Defendants an unfair advantage by allowing them the opportunity to argue foreseeability multiple times.

**{55}** The evidence at trial was directed at causation and the parties' comparative fault. Accordingly, the principles of *Torres,* 1999-NMSC-029, and *Chamberland,* 2001-NMCA-045, apply directly to this case and a jury instruction on independent intervening cause is precluded. With all due deference, I am concerned that the Majority's holding will result in confusion to the jury and inadvertent application of contributory negligence; the outcome our Supreme Court explicitly cautioned us against in *Torres*. 1999-NMSC-029, ¶ 18.

**{56}** For these reasons, I respectfully dissent.

_____

**M. MONICA ZAMORA, Judge**

17